UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CHARLIE PLUNKETT,<br>9100 NW 33rd Court Road,<br>Miami, Florida<br><br>WINNIE BARLOCK,<br>2691 Mercy Drive<br>Las Vegas, Nevada<br><br>CLARISA WELTE,<br>31005 Bunker Drive<br>Temecula, California<br><br>and<br><br>ROSELAINE LABONTE,<br>93 Lois Street,<br>Haverhill, Massachusetts<br><br>on behalf of themselves and others<br>similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>SHAUN DONOVAN, in his capacity as<br>SECRETARY OF THE UNITED STATES<br>DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br><br>451 7th Street S.W.<br>Washington, DC 20410,<br><br>     Defendant. | Case No. _____<br><br>**CLASS ACTION**<br><br>JURY TRIAL REQUESTED |

_____

## CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, on behalf of themselves and others similarly situated, bring this action against Shaun Donovan, Secretary of the U. S. Department of Housing and Urban Development ("HUD"), and allege and state as follows:

## INTRODUCTION

1.      Plaintiffs challenge HUD's failure to protect them and other surviving spouses of reverse mortgage borrowers from foreclosure and displacement, as required by the reverse mortgage statute, 12 U.S.C. § 1715z-20(j), titled "Safeguard to Prevent Displacement of Homeowner."  The result of HUD's failure is that a multitude of surviving spouses of reverse mortgage borrowers are now facing foreclosure and displacement from homes they expected to live in for the rest of their lives.

2.      Congress enacted a federal program to insure reverse mortgages in 1988, called the Home Equity Conversion Mortgage ("HECM") program, "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing and subsistence needs at a time of reduced income."  12 U.S.C. § 1715z-20(a).

3.      The central purpose of this program is to allow older homeowners to access their home equity without risking foreclosure and displacement.  In furtherance of this purpose, the statute clearly states the intent of Congress that both spouses be safe and secure in their home while either of them is still living there. 12 U.S.C. § 1715z-20(j) ("Subsection (j)").

4.      Subsection (j) states that a HECM cannot be called due and payable until the death of the homeowner and specifies that, "For purposes of this subsection, the term 'homeowner' includes the spouse of a homeowner."

5.      HUD has failed to implement the plain language of the safeguard protecting spouses of reverse mortgage borrowers from foreclosure.  Its regulations and mortgage documents only protect individuals who are named on the HECM, not unnamed spouses.

6.      Unscrupulous mortgage brokers and lenders have stepped into the breach, and have engaged in predatory practices to strip homeowners of their rights, without any intervention by HUD.  As Plaintiffs' experiences illustrate, many homeowners sign away their rights without even knowing they are doing so, or under the fraudulent promise that they will be protected. They only find out the truth too late:  when their spouses die, and their lenders demand full repayment of their loans.

7.      HUD's failure to comply with the law has had tragic consequences for spouses of reverse mortgage borrowers, who unexpectedly face a demand to satisfy the mortgage in full soon after losing their spouses, and subsequent foreclosure and eviction proceedings if they cannot repay.  The number of these foreclosures will only increase in the coming years, given that the program expanded dramatically in the last decade.

8.      HUD controls every aspect of the reverse mortgage program. Congress gave HUD broad statutory powers to protect homeowners and lenders and to ensure the purposes of the program. 12 U.S.C. § 1715z-20(i).  HUD has failed to do so.

9.      This Court has already ruled that HUD's interpretation of the statute is invalid as applied to two surviving spouses, in *Bennett v. Donovan*, Case No. 11-498 (ESH), 2013 U.S. Dist. LEXIS 140440 (D.D.C. Sept. 30, 2013):  "Subsection (j) means what it says:  the loan obligation is deferred until the homeowner's *and* the spouse's death.  Therefore, the judicial inquiry stops there." *Id.* at *17.  This action seeks relief on behalf of all surviving spouses, to

ensure that Defendant executes its mandate to protect this vulnerable population from losing their homes.

10.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* for judicial review of final agency actions by HUD.  Plaintiffs challenge HUD's promulgation of regulations governing the HECM program that violate the statutory protection for spouses.

11.     Plaintiffs seek a declaration that HUD's regulations violate Subsection (j).  They also seek a preliminary injunction requiring HUD to act under the mandate given it by Congress and to use its statutory powers to prevent the displacement of Plaintiffs and the Class from their homes pending a decision on the merits of this case and HUD's determination of appropriate relief.

## THE PARTIES

12.     Plaintiff Charlie Plunkett resides at 9100 NW 33rd Court Road, Miami, Florida. Mr. Plunkett is currently facing foreclosure in Miami-Dade County Court as a result of Defendant's failure to protect surviving spouses.

13.     Plaintiff Winnie Barlock resides at 2691 Mercy Drive, Las Vegas, Nevada.  Ms. Barlock is currently facing foreclosure as a result of HUD's failure to protect surviving spouses.

14.     Plaintiff Clarisa A. Welte resides at 31005 Bunker Drive, Temecula, California. Mrs. Welte is currently facing foreclosure as a result of HUD's failure to protect surviving spouses.

15.     Plaintiff Roselaine LaBonte resides at 93 Lois Street, Haverhill, Massachusetts. Mrs. LaBonte is currently facing foreclosure as a result of HUD's failure to protect surviving spouses.

16.     Defendant Shaun Donovan is the Secretary of the Department of Housing and Urban Development, a cabinet-level federal agency.  HUD's headquarters is at 451 7th Street S.W., Washington, DC, 20410.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e).

## NATURE OF THE CASE

### The HECM Program

19.     The HECM program was originally authorized by the Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815 (1988); 12 U.S.C. § 1715z-20. Under the program, the United States Government insures reverse mortgages originated by private lenders.

20.     A reverse mortgage is a loan that allows older homeowners to convert part of the equity in their homes into cash.  It is the "reverse" of a traditional mortgage, in which the borrower repays the borrowed sum on a monthly basis: reverse mortgage borrowers receive money in exchange for their home equity. Borrowers can choose to receive the loan proceeds in a lump sum, on a monthly basis, or they can draw on a line of credit periodically as needed. Reverse mortgage borrowers are not required to make monthly or other periodic payments to repay the loan.  Instead, the loan balance increases over time, and the loan does not become due and payable until one of a number of defined events occurs.  12 U.S.C. § 1715z-20(j).

21.     The HECM program was first created as a pilot program that was permitted to insure up to 2,500 reverse mortgages.  Since then, Congress has made the program permanent

and has greatly expanded it.  From the program's inception through September 2012, HUD has

insured more than 770,000 HECMs. Of these, over 595,000 HECMs are still outstanding.[1]

22.     HUD administers the HECM program, and issued its governing regulations.

Interpretations of the HECM regulations are provided in HUD's Handbook, 4235.1 REV-1

(1994), Home Equity Conversion Mortgages, in a series of "mortgagee letters" directed to

private lenders participating in the program, and in its online "HECM Servicing Frequently

Asked Questions."

23.     Recognizing the complex nature of the reverse mortgage product, the HECM

statute has always required specific disclosures about the rights, limited liability, costs and other

terms of the mortgage, and has required that homeowners receive counseling before taking out a

loan that HUD would insure under the program.  12 U.S.C. § 1715z-20(e) & (f).  Throughout the

history of the HECM program, HUD has not provided this counseling directly, but has approved

private organizations to provide it.

24.     The HECM statute states that the loan becomes "due and payable" upon the death

of the homeowner(s), sale of the property, or other events to be determined by HUD.  12 U.S.C.

§ 1715z-20(j).  HUD's regulations add to this list of "due and payable" events the mortgagor's

change of principal residence; the failure to perform an obligation of the mortgage, and the

mortgagor's failure to occupy the property for more than 12 consecutive months because of

physical or mental illness.  24 C.F.R. § 206.28(c)(2).

## HUD Has Failed to Protect Spouses from Displacement

25.     The federal reverse mortgage statute includes a section titled "Safeguard to

prevent displacement of homeowner." This provision states that Defendant "may not insure a

---

[1] *See Total HECM Cases Endorsed for Insurance by Fiscal Year of Endorsement and Borrower Characteristics, September 30, 2012 ,* found at http://1.usa.gov/1izjHJZ (viewed January 3, 2014).  This is the latest date for which

home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary."  12 U.S.C. § 1715z-20(j).  This provision states that "[f]or purposes of this subsection, the term 'homeowner' includes the spouse of a homeowner," so the death of a spouse – even one who is not named on the HECM – does not trigger the obligation to pay off the mortgage.  *Id.*

26.      The legislative history on the passage of the HECM legislation confirms the plain meaning of this statutory provision.  The Senate Report on the legislation states that HECM mortgages shall "defer[ ] any repayment obligation until death of the homeowner *and* the homeowner's spouse . . ." (emphasis added).[2]

27.      HUD has never implemented the plain meaning of the anti-displacement statutory mandate.  The regulations, in violation of the statute, substitute the term "mortgagor" for "homeowner" and "spouse," and state that the duty to satisfy the mortgage occurs when the *"mortgagor* dies and the property is not the principal residence of at least one surviving *mortgagor. . ."* 24 C.F.R. § 206.27(c) (emphasis added).  HUD defines mortgagor as "each original borrower under a mortgage.  The term does not include successors or assigns of a borrower."  24 C.F.R. § 206.3.

28.      HUD's mortgage documents further contravene the statutory protection.  The standard Mortgage, also written by HUD, which requires its use in all HECM transactions, terminates the mortgage upon the death of the borrower, regardless of whether a non-borrowing spouse survives the borrower.

---

[2] Report 100-21 by the Senate Committee on Banking, Housing and Urban Affairs accompanying S. 825, 100th Congress, Section 135 (reporting on Subsection 254(j)).

29.     The HUD regulations' substitution of the term "mortgagor" for "homeowner," and their adoption of a definition of "mortgagor" that is contrary to and more limited than the HECM's statutory definition of "mortgagor," makes the HECM "due and payable" upon the death of a borrowing spouse.  Thus, the regulations ignore a key statutory protection for the surviving spouse who is not named on the HECM, as provided by 12 U.S.C. § 1715z-20(j).

### The HECM Statute Requires HUD to Act to Protect Spouses from Displacement

30.     Subsection (i) of the reverse mortgage statute states that in order to further the purposes of the reverse mortgage program, HUD must take any action necessary to provide reverse mortgage borrowers and lenders with any funds they are entitled to under the reverse mortgage contracts.  12 U.S.C. § 1715z-20(i)(1).  Such actions may include, but are not limited to, paying funds from the FHA insurance fund, and accepting assignment of the mortgage.  12 U.S.C. § 1715z-20(i)(2).

31.     Protecting spouses from displacement is an express purpose of the reverse mortgage program.  When a reverse mortgage loan comes due and payable due to the death of a HECM borrower, the HECM borrower's spouse is entitled to protection from displacement even if he or she is not a named borrower on the mortgage.  HUD has both the statutory power and the obligation to protect these spouses from displacement.

### PLAINTIFFS' REVERSE MORTGAGE TRANSACTIONS

*Charlie Plunkett*

32.     Plaintiff Charlie Plunkett is 87 years old.  He and his wife of 44 years, Laura Plunkett, purchased their home at 9100 N.W. 33rd Court, Miami, Florida, in 1986.  It was the first and only house they ever owned.  They took title as husband and wife.

33.      In or around September 2008, the Plunketts were approached by Rudy Hernandez

8

of Infinite Title about obtaining a reverse mortgage on their home.  At this time, Charlie Plunkett was 82 years old, and his wife was age 87.

34.    Mr. Hernandez visited the Plunketts in their home.  He expressly stated that the Plunketts would be co-borrowers on the reverse mortgage, and that if one of them died while they were still living in the home, the other spouse would not have to repay the mortgage.

35.    Mr. and Mrs. Plunkett were presented with a number of documents for their signature, all of which reflect their intention to jointly undertake the reverse mortgage.  The mortgage application, Good Faith Estimate, and Truth in Lending Disclosure all list both Mr. and Mrs. Plunkett as "applicants" or "borrowers."

36.    On October 23, 2008, while the reverse mortgage was being finalized, Charlie Plunkett was hospitalized for treatment of a heart condition.  He remained in the hospital and on medication until November 4, 2008.

37.    On October 30, 2008, Mr. Hernandez visited Mr. Plunkett in the hospital and requested that he sign additional documents for the reverse mortgage closing. He reiterated that both Charlie and his wife would be borrowers, and if either spouse were to die, the surviving spouse would be able to remain in the home.

38.    Mr. Plunkett signed the documents presented to him by the title agent.  Mrs. Plunkett was not in the hospital when Mr. Plunkett signed the documents. Unbeknownst to him, among the documents he signed that day was a quitclaim deed in which Mr. Plunkett transferred all of his interest in their home to his wife.

39.    That same day, Laura Plunkett signed a promissory note and mortgage listing her as the sole owner of the Plunketts' home and the sole borrower in a reverse mortgage transaction secured by that home.  As part of this transaction, Laura Plunkett also signed a Second Note,

Second Deed of Trust and a Home Equity Conversion Agreement with HUD.

40.     Mr. Plunkett never received counseling regarding the reverse mortgage.  At no time were the Plunketts advised that Mr. Plunkett would be surrendering his ownership interest in their home, that he would not be a borrower on the mortgage, and that not being a listed borrower would very likely result in losing his home.

41.     Mr. Plunkett did not know that his name was taken off the mortgage until after his wife passed away, on July 23, 2010.  About six months later, Mr. Plunkett received a notice from James B. Nutter, the current servicer of the reverse mortgage, stating that he must pay the mortgage in full or face foreclosure and displacement.

42.     James B. Nutter filed a foreclosure action in Miami-Dade County Court on September 21, 2011.  The foreclosure case is set for trial on March 24, 2014.

*Winnie Barlock*

43.     Plaintiff Winnie Barlock is 74 years old.  She and her husband, Carl Barlock, moved into their home at 2691 Mercy Drive, Las Vegas, Nevada, in 1998.  Originally the mortgage on the home was in Mrs. Barlock's name only.  Mr. Barlock was added at a later date, when they refinanced their mortgage.

44.     In or around September 2006, the Barlocks responded to a television advertisement by Financial Freedom, promising they could access the equity in their home and live in it for the rest of their lives.  Mr. Barlock suffered from Alzheimer's disease and a debilitating back injury.  The couple was trying to plan for Mrs. Barlock's security if he died before she did.

45.     The Barlocks called for more information, and first met with Rob Richey of Skofed Mortgage, a wholesale lender for Financial Freedom, at his office.

46.     At the time they applied for and signed the mortgage documents, Winnie Barlock was 66 years old, and her husband was age 74.

47.     The information the Barlocks provided and the documents that Financial Freedom gave them confirm their joint participation in the transaction, and reflect their intention and expectation that they **both** would be borrowers on the mortgage.  Multiple documents, including the Barlocks' mortgage application, borrower certification, certificate of HECM counseling, and Good Faith Estimate list Winnie Barlock as an "applicant" or a "borrower."

48.     Only shortly before the scheduled closing date, Mr. Richey called the Barlocks from his cell phone.  He said he had just noticed that Carl was older than Winnie, not the other way around, so Winnie would have to come off the mortgage.   He did not explain this any further and ended the phone call.

49.     At the closing, on December 8, 2006, Mr. Richey instructed Mr. Barlock alone to sign the Home Equity Conversion Deed of Trust, which listed him as the sole owner of the Barlocks' home and the sole borrower in a reverse mortgage transaction secured by that home. As part of this transaction, Carl Barlock also signed a Second Note, Second Deed of Trust and a Home Equity Conversion Agreement with HUD.

50.     Mrs. Barlock also signed various documents that day.  Unbeknownst to her, Mrs. Barlock signed a document through which she quit claimed all her interest in their home to her husband.

51.     At no time were the Barlocks advised that Mrs. Barlock was surrendering her interest in the property or what would happen if her husband predeceased her.

52.     Carl Barlock died on November 14, 2012.  In early January 2013, an appraiser came to the house.  This was the first time that Mrs. Barlock learned that the lender was

demanding repayment of the mortgage.

53.     An entity named "Trustee Corps" sent a notice to Carl Barlock at the property address on September 19, 2013, stating that "your mortgage loan payment is past due, and your property has been referred to foreclosure."

54.     A mediation is scheduled for March 12, 2014.  If the parties cannot resolve the matter at that time, the trustee will record the notice of sale of the Barlocks' home.

***Clarisa Welte***

55.     Plaintiff Clarisa Welte is 78 years old.  She and her husband, Kenneth Welte jointly owned their home at 31005 Bunker Drive, Temecula, California, from 1997 to 2005.  The Weltes were married in 1959, and jointly owned this property and before that their home in Arcadia, California for most of their 51-year marriage.

56.     In early 2005, when Clarisa was 69 years old and her husband was 72, the Weltes saw an advertisement in the newspaper for reverse mortgages.  Mr. Welte called Wells Fargo for more information.

57.     A Wells Fargo "reverse mortgage consultant" named Cheryl Hagar sent Mr. Welte a 2-page brochure titled "Reverse Mortgages Allow Seniors To Stay In Their Homes," which among other things stated, "reverse mortgages allow seniors an opportunity to remain in their home **for life**."  (emphasis added)

58.     Ms. Hagar subsequently visited the Weltes at their home.  She told them that they would have no mortgage payments and that they would be able to live in their house for the rest of their lives.

59.     Clarisa and Kenneth Welte's housing counseling session was done over the telephone with a counselor, Carole Sparrow, on or about March 15, 2005.  The Certification of

Counseling lists both the Weltes as "borrowers."  At no point in the process, including the required counseling session, did Ms. Hagar or anyone else inform the couple that they would not both be borrowers, or that if one of them died, the other would have to repay the mortgage or face foreclosure.

60.     The loan application dated April 29, 2005, prepared by the Wells Fargo interviewer falsely stated that title to the property was held in the name of Kenneth Welte alone. At that time both Clarisa and Kenneth were on title and had been on title continuously since the property was purchased in 2007.  The loan application prepared by Wells Fargo also failed to include Co-Borrower information for Mrs. Welte despite the following explicit instruction in the application: "Co-Borrower information must be provided when a person other than the "Borrower" (including the Borrower's spouse) is a co-owner of the real property that will be used as a basis for loan qualification or the Borrower's spouse is not a co-owner of the real property that shall be used as a basis for loan qualification, but the Borrower resides in a community property state or the securing property is located in a community property state."  In fact, at the Mrs. Welte was a co-owner of the property.  In addition, the Weltes resided in and the property was located in a community property state.   Nevertheless, the loan application incorrectly excluded Mrs. Welte as Co-Borrower and her required signature as Co-Borrower was not obtained.

61.     The closing on the reverse mortgage took place in the Weltes' home on May 6, 2005.  During the closing, Mrs. Welte unknowingly signed a quitclaim deed conveying all title in the Weltes' home to her husband.  She was never informed that she was transferring her interest in the property, or that she would not be a borrower on the loan.

62.     On the same day, Kenneth Welte signed a promissory note and mortgage with

Wells Fargo, which listed Kenneth as the sole owner of the Weltes' home and the sole borrower in a reverse mortgage transaction secured by that home. As part of this transaction, Kenneth Welte also signed a Second Note, Second Deed of Trust and a Home Equity Conversion Agreement with HUD.

63.     A few weeks later, on May 23, 2005, Kenneth Welte signed a deed conveying the home back to himself and Clarisa as joint owners, apparently on the advice of Wells Fargo that it would protect Mrs. Welte if Mr. Welte were to predecease her.  Mrs. Welte was never told that Wells Fargo had removed her from the title, and then attempted to reinstate her, until after her husband's death.

64.     Mr. Welte died on July 18, 2011.

65.     On November 6, 2012, Wells Fargo sent a demand letter stating that the entire amount of the loan was due and payable, and if it was not paid by May 5, 2013, Wells Fargo intended to accelerate the note and pursue its remedies under the Note and Deed of Trust.

66.     On February 11, 2013, Wells Fargo initiated foreclosure proceedings against Clarisa Welte by issuing a Notice of Default.

67.     Mrs. Welte filed an action against Wells Fargo and Fannie Mae in response to their notice that they planned to sell her home at a foreclosure sale.  The action is titled *Welte v. Wells Fargo*, 5:13-cv-463-JGB-SP (C.D. Cal.). The claims include declaratory relief, reformation of contract, negligence, fraud by non-disclosure, constructive fraud, and unfair business practices under California's Unfair Competition Law.  The district court sustained these claims over Defendants' motion to dismiss in a decision dated December 18, 2013.  The district court dismissed Mrs. Welte's claim for elder fraud (a California state law claim) with leave to amend, and sustained her claim under California's Unfair Competition Law in part, with leave to

amend.  On December 30, 2013, Mrs. Welte filed a second amended complaint.

*Roselaine LaBonte*

68.     Plaintiff Roselaine LaBonte is 74 years old.  She and her husband Arthur resided at 93 Lois Street, Haverhill, Massachusetts.  They built their home and began living there in 1965.

69.     In 2007, the LaBontes received an invitation in the mail to attend a lunchtime seminar in Salisbury, Massachusetts, hosted by Jack Belles of Towne and Country Mortgage, a wholesale lender and/or broker for Financial Freedom.  At that time, Arthur LaBonte was 79, and Roselaine LaBonte was 67.

70.     At the seminar, the LaBontes and others were shown a Financial Freedom film promoting reverse mortgages, which informed them that by entering into a reverse mortgage, they could remain in their home as long as they lived, and they would not have to pay off the mortgage unless they sold their house.

71.     Jack Belles later came to the LaBontes' home with the documents he instructed them to sign in order to initiate the transaction.

72.     Mrs. LaBonte never received counseling.  Mr. LaBonte was extremely hard of hearing, and he could not have engaged in an hour-long telephone counseling session, as the counseling certificate suggests.  Mrs. LaBonte was with Mr. LaBonte throughout these meetings. Neither Mrs. LaBonte nor Mr. LaBonte received any counseling or information of any kind as to the legal consequences of Mr. LaBonte signing a reverse mortgage in his name alone, or what would happen if Mr. LaBonte died before Mrs. LaBonte.

73.     On May 24, 2007, Mr. Belles came to the LaBontes' home with the closing documents.  He told Mrs. LaBonte that she would not have to sign the loan.  He stated, "You do

not need to sign, you will be all right."  Every communication between Mr. Belles and the LaBontes was consistent:  they would be able to live in their home until they sold it, or until they both died.

74.     Arthur LaBonte died on May 19, 2010.  Less than a month later, on June 9, 2010, Mrs. LaBonte received a letter from Financial Freedom stating that the death of Mr. LaBonte was a "maturity event," and that the reverse mortgage was now immediately due and payable.

75.     Financial Freedom pursued foreclosure on the home until Mrs. LaBonte obtained a preliminary injunction just days before the scheduled sale, on May 17, 2012.  *LaBonte v. One West Bank et al.*, No. 12-CV-148, is pending in Northeast Housing Court in Essex County, Massachusetts.  The court denied Defendants' motion to dismiss, and the case is currently in the discovery phase.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class that includes any current or future surviving spouse of a Home Equity Conversion Mortgage borrower who was married to the borrower at the time the mortgage was consummated, was not listed as a borrower on the mortgage, and where the lender states that the mortgage is due and payable due to the death of the borrower, and the subject property has not been sold to a third party ("Class").  The Class seeks injunctive relief protecting them from displacement, and declaratory relief recognizing their status as surviving spouses entitled to protection from displacement.

77.     Pending the determination of a remedy, Plaintiffs also seek a preliminary injunction enjoining HUD to exercise its statutory powers to ensure protection for Plaintiffs and the Class.

16

78.     The members of the Class are so numerous that joinder is impracticable.

Plaintiffs are informed and believe that there are thousands of Class Members, based on the fact

that Defendant has insured thousands of new reverse mortgages per month for many years.  In

October and November 2013 alone, Defendant endorsed 2,759 reverse mortgages.  In every year

from 1990 to 2012, a majority of reverse mortgages were issued to a sole mortgagor.

79.     Common questions of law exist as to all members of the Class.  The primary

question is whether HUD's regulations violate the HECM statute, by failing to accord the non-

borrowing spouse protection from foreclosure and displacement after the borrowing spouse dies.

The second question is whether, in light of the exigent circumstances presented by Plaintiffs'

foreclosures and those of the Class, HUD is required to act to protect them and, indeed, whether

HUD has unreasonably delayed action.  Plaintiffs' claims are based on the Administrative

Procedure Act, the federal reverse mortgage statute, and its corresponding regulations.  Thus,

they are amenable to decision on a class-wide basis.

80.     Plaintiffs' claims are typical of the claims of the members of the Class, for the

reason that the Plaintiffs and the Class are facing foreclosure and eviction from their family

homes due to Defendant's failure to protect them from displacement.  Plaintiffs and the Class

stand to suffer grave and irreparable harm if this action is not enjoined.

81.     Plaintiffs are adequate representatives of the Class they seek to represent.  Their

interests do not conflict with the interests of the individual members of the Class.  Plaintiffs have

retained counsel who are competent and experienced in complex class actions, mortgage law,

and administrative law.  The interests of the members of the Class will be fairly and adequately

protected by Plaintiffs and their counsel.

82.     Plaintiffs have suffered the same damage, and stand to suffer the same damage in

the future, as Class Members generally, and they are intent on obtaining relief that will prevent

the ultimate loss of their homes and those of Class Members.  Plaintiffs are fully committed to

fairly, adequately, and vigorously representing and protecting the interests of the members of the

Class.

83.     Pursuant to Federal Rule 23(b)(2), Plaintiffs and the Class are entitled to class

certification, because Defendant (1) has violated the statute by passing regulations that contradict

a core statutory protection; and (2) has refused to comply with its statutory mandate to protect

them from displacement, making final injunctive relief and declaratory relief appropriate

respecting the Class as a whole.  Without the injunctive relief sought here, Plaintiffs and the

Class will lose their homes.

### FIRST CLAIM FOR RELIEF

**HUD's Contravention of the Anti-Displacement Provision of
the HECM Statute Is Arbitrary & Capricious or Otherwise Not
in Accordance with Law & Exceeded HUD's Statutory Authority
in Violation of § 706(2) of the APA**

84.     Plaintiffs incorporate by reference as if fully set forth herein all of the allegations

of the Complaint.

85.     Federal agency action is unlawful if it is arbitrary, capricious or otherwise not in

accordance with law, or if it exceeds the agency's statutory authority. 5 U.S.C. § 706(2).

86.     The anti-displacement provision of the HECM statute provides the spouse of a

HECM homeowner the same protection from displacement as the homeowner named on the

mortgage.  *See* 12 U.S.C. § 1715z-20(j).

87.     The HECM statute's anti-displacement provision states that reverse mortgages

must "provide[] that the homeowner's obligation to satisfy the loan obligation is deferred until

the homeowner's death, sale of the property" or other occurrence to be identified by HUD.

18

88.    "Homeowner" is specially defined for purposes of 12 U.S.C. §1715z-20(j) to include a homeowner's spouse.  Spouses who are not named on the HECM mortgage are "homeowners" entitled to this protection.

89.    HUD failed to give effect to the plain meaning of the anti-displacement statutory mandate and has, in fact, enacted regulations that violate it.  Specifically, 24 C.F.R. § 206.27(c) states that the mortgage is due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor."  The regulations define a "mortgagor" to exclude the homeowner's spouse.

90.    HUD's regulations are arbitrary and capricious or contrary to law, and exceed HUD's statutory authority.

91.    Plaintiffs and the Class Members are "homeowners" entitled to protection from displacement by the HECM statute.  *Bennett v. Donovan,* Case No. 11-498 (ESH), 2013 U.S. Dist. LEXIS 140440 (D.D.C. Sept. 30, 2013).

92.    Had HUD properly implemented the anti-displacement provision of the HECM statute, the reverse mortgages undertaken by Plaintiffs' spouses and those of the Class would not be due and payable and their homes would not be threatened with foreclosure.

93.    Plaintiffs and Class Members have been injured and continue to be injured by HUD's failure to accord them the protections provided by 12 U.S.C. § 1715z-20(j).

94.    HUD is mandated by the HECM statute to take all actions necessary to ensure the purposes of the program. 12 U.S.C. § 1715z-20(i)(1). The protection from displacement is one of those purposes. HUD must take action to ensure this core protection.

## SECOND CLAIM FOR RELIEF

**HUD Has Failed To Take Immediate Action Necessary To Provide Lenders With Funds To Which They Are Entitled, In Order To Protect Surviving Spouses From Displacement, In Violation of Section 706(1) of the Administrative Procedure Act**

95.     Plaintiffs incorporate by reference as if fully set forth herein all of the allegations of the Complaint.

96.     The Administrative Procedure Act, 5 U.S.C. § 706(1), empowers this court to "compel agency **action** unlawfully withheld or unreasonably delayed" (emphasis added).

97.     Subsection (i) of the reverse mortgage statute states that "in order to further the purposes of the [reverse mortgage program], the Secretary shall take any **action** necessary . . . to provide any mortgagee under this section with funds . . . to which the mortgagee is entitled under the terms of the insured mortgage or ancillary contracts authorized in this section" (emphasis added).  Such "[a]ctions . . . may include . . . disbursing funds to the mortgagor or mortgagee from the Mutual Mortgage Insurance Fund" and "accepting an assignment of the insured mortgage . . ."

98.     Protecting spouses of reverse mortgage borrowers from displacement is an express purpose of the HECM program.

99.     Where the "mortgagor" spouse has died, and the non-mortgagor spouse remains in the property, Defendant is required to use the powers given it under 12 U.S.C. § 1715z-20(i) to ensure that Plaintiffs and the Class do not lose their homes to foreclosure. Defendant must act immediately to protect Plaintiffs and the Class from foreclosure and eviction proceedings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)      Enter a declaratory judgment that HUD failed to properly implement the anti-displacement protections in the HECM statute, has illegally adopted regulations that contravene this protection, and that the Plaintiffs and the Class are entitled to the protections of 12 U.S.C. § 1715z-20(j);

b)      Enter a declaratory judgment that 24 C.F.R. § 206.27(c)(1) is arbitrary and capricious and/or contrary to law, as applied to Plaintiffs and the Class;

c)      Enter a declaratory judgment that all spouses of reverse mortgage borrowers are "homeowners" entitled to protection from displacement;

d)      Enter preliminary and permanent injunctions requiring HUD to use its authority under the reverse mortgage statute to protect Plaintiffs and the Class from foreclosure and displacement;

e)      Award plaintiffs costs and attorney fees under 28 U.S.C. § 2412 or as otherwise permitted;

f)      Grant all other appropriate relief; and

g)      Retain jurisdiction of this action to grant ongoing relief as may be required.

Dated: February 27, 2014

Respectfully submitted,

_/s/ Jean Constantine-Davis_

_/s/ Craig L. Briskin_

Jean Constantine-Davis (D.C. Bar No. 250084)
(jcdavis@aarp.org)
AARP Foundation Litigation
601 E Street NW
Washington, DC 20049
Tel:  202-434-2060
Fax: 202-434-6424

Craig L. Briskin (D.C. Bar No. 980841)
cbriskin@findjustice.com
Steven A. Skalet (D.C. Bar No. 359804)
(sskalet@findjustice.com)
Mehri & Skalet, PLLC
1250 Connecticut Avenue NW
Suite 300
Washington, DC 20036
Tel:  202-822-5100
Fax:  202-882-4997

Counsel for Plaintiffs