## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**CHARLIE PLUNKETT,** *et al.***,**                 )
                                                    )
        **Plaintiffs,**                             )
                                                    )
        **v.**                                      )   **Civil Action No. 14-cv-326 (ESH)**
                                                    )
**JULIÁN CASTRO**[1]**, in his official capacity as** )
**SECRETARY OF HOUSING**                            )
**OF HOUSING AND URBAN DEVELOPMENT** )
                                                    )
        **Defendant.**                              )
_____ )

## MEMORANDUM OPINION

In 2011, three surviving spouses of deceased individuals who had entered into Home

Equity Converse Mortgages ("HECMs") sued the Secretary of the Department of Housing and

Urban Development ("HUD") in his official capacity, alleging that regulations implementing the

federal HECM insurance program violated the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 551, *et seq*.  This Court initially dismissed the case for lack of standing.  *See Bennett v.*

*Donovan* ("*Bennett I*"), 797 F. Supp. 2d 69, 77-78 (D.D.C. 2011).  The Court of Appeals

reversed.  *See Bennett v. Donovan*, 703 F.3d 582, 590 (D.C. Cir. 2013).

On remand, this Court granted summary judgment to plaintiffs on the grounds that HUD

violated 12 U.S.C. § 1715z-20(j) by insuring HECMs (also known as reverse mortgages) which

failed to protect the rights of non-borrower surviving spouses.  *Bennett v. Donovan* ("*Bennett*

_____

[1] The new Secretary of Housing and Urban Development, Julián Castro, is substituted for former
Secretary Shaun Donovan as a matter of law under Fed. R. Civ. P. 25(d).

*II*'), 2013 WL 5424708, at *7 (D.D.C. Sept. 30, 2013).[2]  Accordingly, this Court remanded the case to the agency to fashion appropriate relief.  *Id.*

In February 2014, while this remand was pending, Charlie Plunkett and three other non-borrower surviving spouses of now-deceased HECM holders filed suit on behalf of themselves and other similarly situated non-borrower surviving spouses.  In their complaint, they allege identical violations of 12 U.S.C. § 1715z-20(j) and that HUD's failure to take immediate action in accordance with *Bennett II* violated the APA.  (Compl., Feb. 27, 2014 [ECF No. 1].)  After HUD issued two determinations on remand—the first as to the two *Bennett* plaintiffs and the second as to the *Bennett* plaintiffs as well as the four named plaintiffs in *Plunkett*—the Court consolidated the two cases and transferred the *Bennett* plaintiffs to the *Plunkett* case. (*See* Minute Order, June 30, 2014.)

The Court now has before it cross motions for summary judgment. (Pls.' Mot. for Summ. J. ("Mot."), July 10, 2014 [ECF No. 36]; Def.'s Mem. in Support of Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. and in Opp. To Pls.' Mot. for Summ. J. ("Opp."), July 21, 2014 [ECF No. 37].)  The Court also has before it a motion for class certification. (Mot. for Class Cert., Feb. 27, 2014 [ECF No. 2].)  For the reasons stated below, plaintiffs' motion for summary judgment and defendant's motion for summary judgment will be granted in part and denied in part.  The motion for class certification will be denied without prejudice.

---

[2] Though this decision was the second Memorandum Opinion issued by this Court the parties referred to this decision in their papers as "*Bennett I*."  To avoid confusion, this Memorandum Opinion will refer to the first decision from 2011 that dismissed the case on standing grounds as *Bennett I* and the second decision from 2013 granting plaintiffs' motion for summary judgment as *Bennett II*.

# BACKGROUND

## I.     FACTUAL AND PROCEDURAL HISTORY

The material facts and statutory framework relevant to this case were described in detail in this Court's prior opinions and the opinion of the Court of Appeals. *See Bennett*, 703 F.3d at 584-86; *Bennett II*, 2013 WL 5424708, at *1-2; *Bennett I*, 797 F. Supp. 2d at 72-73. Therefore an abbreviated and updated version will suffice.

This case arises from the Home Equity Conversion Mortgage insurance program.  This program is run by the Federal Housing Administration within HUD pursuant to the National Housing Act ("NHA"), 12 U.S.C. §§ 1701, *et seq.*  HECMs provide a mechanism for elderly homeowners to convert "a portion of accumulated home equity into liquid assets." 12 U.S.C. § 1715z-20(a). When an elderly homeowner enters into a reverse mortgage, he or she receives some combination of a lump sum payment, monthly payments, or a line of credit.  *See id.* § 1715z-20(d)(9).  Though interest is charged each month, unlike a traditional mortgage, an HECM loan is generally not repaid until a specific "trigger" event occurs, such as the death of the borrower or the sale of the home.  *Id.* § 1715z-20(j); 24 C.F.R. § 206.27(c)(1).  This non-recourse loan is secured by a mortgage on the borrower's home.  12 U.S.C. § 1715z-20(d)(3). As a non-recourse loan, the lender may only recover the borrower's house (or the sale value thereof).  *Id.* § 1715z-20(d)(7).  Therefore, because the lender may suffer a financial loss if the value of the home at the time of the triggering event is less than the outstanding balance on the HECM loan, Congress created an insurance program administered by HUD to incentivize private lenders to participate in the HECM market.  The insurance program is funded in part by monthly mortgage insurance premiums that are paid by the lenders, though these costs are generally passed on directly to the borrowers.  *See* 24 C.F.R. § 206.103, .25.

Because HUD insures these loans, it limits the maximum amount that lenders can loan to borrowers.  This maximum amount is calculated by multiplying the appraised value of the home (up to $625,500) by a fraction known as the "principal limit factor" ("PLF").  *See id.* § 206.3.  The principal limit factor is an actuarial variable based on the age of the youngest borrower and the expected loan interest rate.  Under this scheme, an older borrower will almost always have a higher PLF.  For purposes of these loans, therefore, if there is more than one borrower, the younger borrower's PLF is used under 24 C.F.R. § 206.33.  Prior to *Bennett II*, married couples often took out HECMs only in the name of the older spouse in order to receive a bigger loan amount up front.  In fact, each of the six named plaintiffs was younger than their now deceased spouses who took out the HECMs solely in their own names.  Had these plaintiffs been on the HECMs originally, they would have received less money from their lenders.

The maximum loan amount that HUD will insure is the lower of the appraised value of the home at the time the HECM is taken out and $625,500.  To prevent the lender from incurring uninsured losses after the maximum loan amount is reached, the lender is permitted to assign the HECM to HUD when the HECM reaches 98% of the maximum loan amount.  *See* 24 C.F.R. § 206.107(a).  If the lender makes this election, HUD takes on full responsibility for servicing the loan until a trigger event occurs and, when such an event occurs, HUD may foreclose the home if necessary.

Plaintiffs in these actions are widowed spouses of now deceased holders of reverse mortgages insured by HUD.  Plaintiffs are not listed on the deeds of their homes, nor are they obligors on the reverse mortgages.  *See Bennett I*, 797 F. Supp. 2d. at 72-73; (Compl. at 11, 13-14).  The reverse mortgages at issue contain language from the HECM form contract in effect at the time the loans were entered into between the lenders and the borrowers which permit the

4

lender to demand immediate payment on the loan if the "[b]orrower dies and the [p]roperty is not the principal residence of a least one surviving borrower."  *Bennett I*, 797 F. Supp. 2d. at 73  This language is consistent with 24 C.F.R. § 206.27(c)(1), a regulation promulgated by HUD, which states that "[t]he mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principle residence of at least one surviving mortgagor . . . ."

In *Bennett II*, plaintiffs argued that this regulation violated federal law because it did not protect the non-borrower spouse from foreclosure at the death of the borrower spouse.  In support of their position, plaintiffs relied solely on 12 U.S.C. § 1715z-20(j) ("subsection (j)"). Subsection (j) states,

> [t]he Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the *homeowner's* obligation to satisfy the loan obligation is deferred until the *homeowner's* death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary.  For purposes of this subsection, the term *"homeowner" includes the spouse of the homeowner.* (emphasis added).

This Court agreed holding that the only plausible construction of subsection (j) was that "the loan obligation [should be] deferred until the homeowner's *and* the spouse's death." *Bennett II*, 2013 WL 5424708, at *7.  As required in an APA challenge, the Court remanded the case to the agency in order to fashion appropriate relief consistent with its opinion and order remanding the case.  In providing this remedy, the Court relied expressly on the guidance set forth by the Court of Appeals:

> We do not hold, of course, that HUD is *required* to take [a] precise series of steps, nor do we suggest that the district court should issue an injunction to that effect. Appellants brought a complaint under the Administrative Procedure Act to set aside an unlawful agency action, and in such circumstances, it is the prerogative of the agency to decide in the first instance how best to provide relief.

> Perhaps HUD would provide the precise relief we have outlined, perhaps it would find another alternative, or perhaps it would decide no such relief was appropriate. We recognize that, even if the district court issues a declaratory judgment, appellants still have no *guaranty* of relief. Though of course, if Bennett and Joseph prevailed on the merits in the district court but were dissatisfied with HUD's remedy, they would always have the option to seek review on the ground that HUD's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

*Bennett*, 703 F.3d at 589 (emphasis in original) (internal quotation marks and citations omitted).

While this remand was pending and before HUD issued a formal determination on remand, HUD issued Mortgagee Letter 2014-07. "The Letter provides that, for loans [initiated after August 4, 2014], where there is a sole borrower who was married at the time of loan origination (and the spouse was not on the loan), the HECM documents will contain a provision deferring the due and payable status of the loan until the death of the non-borrowing spouse. This letter thus implements, prospectively, the interpretation of Subsection (j) adopted by this Court in *Bennett* [*II*]." (Status Report, May 12, 2014 [ECF No. 24], at 2.)  On May 2, 2014, FHA published a Federal Register notice soliciting public comments on this Mortgagee Letter.  *See id.*

## II.   *PLUNKETT* AND *BENNETT II* ON REMAND

Several months after this Court issued *Bennett II*, four non-borrower surviving spouses who were not parties in the *Bennett* litigation, filed a new lawsuit on behalf of themselves and a purported class of similarly situated individuals.  (Compl., Feb. 27, 2014 [ECF No. 1].)  In their Complaint, they made the identical challenge made by the *Bennett* plaintiffs that section 206.27(c)(1) violated subsection (j) and further alleged that HUD's failure to act as a result of *Bennett II* violated their rights under APA.  (*Id.*)  Simultaneously, they filed a motion for class certification.   The Court reserved judgment on the motion for class certification, while HUD considered the *Bennett* case on remand.

On June 4, 2014, HUD issued its first determination on remand. (Determination on Remand ("First DOR"), June 4, 2014 [ECF No. 26-2].)  In this twenty-page single spaced decision, the Assistant Secretary for Housing Carol J. Galante concluded that neither Mr. Bennett nor Mrs. Joseph, the two remaining plaintiffs in *Bennett*, was eligible for any relief.  The Commissioner explained,

> I base this decision on my thorough review and careful consideration of the facts and circumstances surrounding the insurance of these two reverse mortgages by FHA and the operation of the HECM program, both as applicable to each reverse mortgage included in this case and in general.  I have carefully considered the recommendations of my staff and the documents, facts, circumstances, potential forms of relief, and other information relevant to this case.  I have carefully weighed the facts in light of the numerous options presented to me.  Based on my review, I have determined that the appropriate, and in fact only, action legally available to the Department with respect to these two reverse mortgages and these Plaintiffs is for the Department to honor the two contracts of insurance as initially endorsed and provide no further relief to the plaintiffs.

(First DOR at 1.)  This determination on remand did not consider the appropriate remedy, if any, for other non-borrower surviving spouses besides the two *Bennett* plaintiffs.[3]  The Court accordingly remanded the *Plunkett* plaintiffs to the agency for immediate review. (*See* Order, June 10, 2014 [ECF No. 29].)

---

[3] The First DOR did, however, recognize the existence of the pending *Plunkett* litigation.  It said,

> While under the current District Court decision, the relief being afforded by the Department will affect only the parties involved in the Joseph and Bennett reverse mortgages, the existence of a recently-filed potential class action law suit in the same court and before the same judge that decided the *Bennett* case would make it irresponsible for the Department to render a determination without first considering the implication in light of this putative class action.  *The Department must be prepared to extend, if necessary, the relief determined appropriate in this matter to an entire class of non-borrowing spouses, but at a minimum to the four named plaintiffs in the pending putative class action.*

(First DOR at 17 (emphasis added).)

**A.  The Mortgagee Optional Election ("MOE")**

On June 24, 2014, Commissioner Galante issued a second determination on remand. (Determination on Remand ("Second DOR"), June 24, 2014 [ECF No. 32-1].)  In this determination on remand, the Commissioner expressly limited her conclusions to the four named plaintiffs in *Plunkett*, as well as the two named plaintiffs in *Bennett*.  The Commissioner once again concluded that HUD was not required to provide any relief as a result of *Bennett II* to any non-borrower surviving spouse, including the four named plaintiffs in *Plunkett*.  However, Commissioner Galante also introduced an alternative, voluntary remedy known as the Mortgagee Optional Election ("MOE").  The Commissioner expressly stated that the MOE applied "only with respect to the[] four Plaintiffs as well as the two Plaintiffs in the *Bennett* case." (Second DOR at 6.)  In order to be eligible for the MOE, the Commissioner explained that five criteria must be met:

(1) the plaintiff must have been married to the borrower at the time of origination of the loan and until the borrower's death;

(2) the plaintiff must have title to the property or a legal right to remain on the property at the date of the election;

(3) the loan cannot be in default for any reason other than the death of the borrower at the date of the election;

(4) there can be no allegations or claims that would invalidate the loan or any such claims must be resolved in favor of the mortgagee; and

(5) the non-borrowing spouse must have had a Principal Limit Factor ("PLF") greater than or equal to the PLF of the HECM borrowing spouse at the date of origination *or* the non-borrowing spouses current PLF is greater than the current unpaid principal balance.

(Second DOR at 6.)  That said, none of the six named plaintiffs at the time of the remand was eligible for the MOE.  The Commissioner also emphasized the optional nature of this program stating that HUD "cannot and will not require any Mortgagee to elect this option; however,

where these conditions are met the Department will permit the Mortgagee to elect to assign such a HECM to FHA," but she also noted that HUD was working on providing the MOE to all similarly situated non-borrower surviving spouses, but "at present . . . the decision applies only to the named *Bennett* and *Plunkett* plaintiffs."[4] (*Id.* at 7.)

### B.  The Trigger Inapplicability Decision ("TID")

Following these decisions, HUD filed an extensive administrative record.[5]  The parties also filed cross-motions for summary judgment.  Notably, in HUD's motion for summary judgment, it identified a remedy not previously considered in its determinations on remand or in the administrative record.  HUD argued, in the context of challenging plaintiffs' standing to bring suit, that "the effect of the Court's decision [in *Bennett II*] and statements invalidating the application of 24 C.F.R. § 206.127(c)(1) to plaintiffs is that 24 C.F.R. § 206.125 is not triggered as a result of their spouses' deaths." (Opp. at 24.)  This trigger inapplicability decision is unlike the MOE in that it was not a voluntary remedy created by HUD, but rather, in HUD's words, it was the "automatic result of the Court's ruling in *Bennett II*." (Def.'s Reply in Further Support of His Mot. to Dismiss or In the Alternative, for Summ. J. ("Gov't Reply"), Aug. 4, 2014 [ECF No. 44], at 8.)  Despite the "automatic" nature of the TID, HUD purported in its briefs to apply the TID only to the named plaintiffs in *Bennett* and *Plunkett* and not to all similarly situated non-borrower surviving spouses.  HUD did not issue the TID as part of the determinations on remand

---

[4] On June 25, 2014, HUD informed all HECM lenders in FHA INFO #11-34, that while it works to set up this program, lenders may request, and will be granted, an indefinite extension to take legal action to foreclose upon those non-borrower surviving spouses who, in the lender's view, would be eligible for the MOE program if HUD applied it to them. (*See* FHA INFO #11-34, June 25, 2014 [ECF No. 32-3].)

[5] The lengthy administrative record was filed in multiple parts.  However, HUD numbered all pages consecutively as if it were a single document.  Therefore, all citations to the administrative record will use the form AR [page number].

which were final agency action.  (*See, e.g.*, First DOR at 1 ("[T[his decision . . . shall serve as

final agency action in this matter.").)  Instead, HUD simply informed the lenders holding the

HECMs of each of the six named plaintiffs by e-mail that they did not need to foreclose until

another triggering event occurred. (*See* Declaration of Sally M. Bene, Ex. A ("Bene E-mail")

(the lender "may elect to hold the HECM loan" because 24 C.F.R. 206.27(c)(1) "does not trigger

the time frames pursuant to 24 C.F.R. 206.125").)

## ANALYSIS

## I.     LEGAL STANDARD

### A.  Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the

pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  However, in a case such as this one

involving review of agency action under the Administrative Procedure Act, the standard set forth

in Rule 56 does not apply.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006).

Instead, summary judgment serves as the mechanism for deciding, as a matter of law, whether

the agency action is supported by the administrative record and is otherwise consistent with the

APA standard of review.  *See Bloch v. Powell,* 227 F. Supp. 2d 25, 31 (D.D.C. 2002), *aff'd*, 348

F.3d 1060 (D.C. Cir. 2003).  "Under the APA, it is the role of the agency to resolve factual issues

to arrive at a decision that is supported by the administrative record, whereas 'the function of the

district court is to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90

(quoting *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769-70 (9th Cir. 1985)).

### B.  The Arbitrary and Capricious Standard

The APA provides that the reviewing court shall set aside an agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706.  An agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At its core, "to survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). The arbitrary and capricious standard of review is highly deferential; the reviewing court will "defer to the wisdom of the agency, provided its decision is reasoned and rational." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (quotation marks and citations omitted); *see also Fox*, 684 F.3d at 74-75 (review is "fundamentally deferential," determining only whether process was "logical and rational") (citing *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).

## II.    STANDING

To establish constitutional standing, plaintiffs must demonstrate (1) that they have suffered an injury-in-fact, (2) that the injury is fairly traceable to the defendant's challenged conduct, and (3) that the injury is likely to be redressed by a favorable decision.  *See NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiffs bear the burden of establishing each element

of standing. *Lujan*, 504 U.S. at 561. While this Court had held that the *Bennett* plaintiffs did not have standing to challenge subsection (j) on the grounds that they had not identified an injury that could be redressed by HUD, *Bennett I*, 797 F. Supp. 2d at 77-78, on appeal the Court of Appeals disagreed.  It reasoned that "[t]he relevant question for standing . . . is not whether relief is *certain,* but only whether it is *likely,* as opposed to merely speculative. *Lujan,* 504 U.S. at 561. There would indeed be a problem of merely speculative relief were the lenders the only party with discretion not to foreclose, but § 1715z–20(i) gives HUD the tools to remove this uncertainty. HUD is the government actor alleged to have caused appellants' injury, and HUD is the actor that can provide relief—that arrangement is sufficient to establish that relief is likely." *Bennett*, 703 F.3d at 589-90 (emphases in original).

HUD now argues that plaintiffs do not have standing because, under the TID, "the effect of the Court's decision [in *Bennett II*] and statements invalidating the application of 24 C.F.R. § 206.127(c)(1) to plaintiffs is that 24 C.F.R. § 206.125 is not triggered as a result of their spouses' deaths." (Opp. at 24.)  In other words, HUD argues that because *Bennett II* rendered the triggering provision of 206.127(c)(1) inapplicable to the *Bennett* plaintiffs as non-borrower surviving spouses, plaintiffs' injuries have been redressed and they therefore no longer have standing to challenge any of HUD's actions on remand.  *See id.*  Plaintiffs respond by arguing that their pleadings challenge not only the legality of 24 C.F.R. § 206.125 as applied to plaintiffs, but also that HUD's actions on remand were arbitrary, capricious, and contrary to law under subsection (j).  They also respond by arguing that HUD's "capitulation [in the form of the TID] . . . while a welcome development, is a far cry from providing all of the relief to which Plaintiffs are entitled" and that they "have standing to proceed on behalf of the" class of similarly situated plaintiffs.  (Pls.' Reply Mem. in Further Support of Pls.' Mot. for Summ. J. and Pls.' Mem. in

Opp. to Def.'s Mot. to Dismiss and Mot. for Summ. J. ("Pls.' Reply"), July 29, 2014 [ECF No. 41], at 4-5.)

The Court holds that plaintiffs have standing for two reasons.  First, while the TID ostensibly provides plaintiffs—at least, the named plaintiffs—with some relief, it does not provide them with all of the relief allegedly within HUD's power.  Plaintiffs request immediate, mandatory assignment under subsection (i).  Such assignment would remove any uncertainty regarding plaintiffs' ability to remain in their homes until their death.  In holding that the *Bennett* plaintiffs had standing, the Court of Appeals concluded, albeit in *dicta*, that subsection (i) "gives the tools to remove this uncertainty." *Bennett*, 703 F.3d at 590.  HUD, however, chose not to apply subsection (i) in that way because it determined that it could not (or should not) do so.  Whether or not plaintiffs succeed on the merits, HUD remains the only "actor that can provide [this] relief" and as the Court of Appeals held "if Bennett and Joseph prevailed on the merits in the district court but were dissatisfied with HUD's remedy, they would always have the option to seek review on the ground that HUD's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Bennett*, 703 F.3d at 589 (internal quotation marks and citations omitted).

Additionally, even a voluntary assignment program, such as the MOE, would provide greater relief to plaintiffs than the TID because it would permit lenders to immediately assign HECMs to HUD, albeit so long as certain criteria are met.  Under any assignment program, those non-borrower surviving spouses who are eligible would gain certainty that a lender with the contractual right to foreclose would not do so because HUD would already have taken complete assignment of the HECM from the lender.  *See Bennett*, 703 F.3d at 590.  Therefore, merely providing some redress does not negate plaintiffs' standing.

Second, insofar as HUD argues that its decision after the commencement of this litigation

not to apply the trigger provision of section 206.27(c)(1) to non-borrower surviving spouses

prevents those non-borrower surviving spouses from bringing the present challenge, its challenge

is better characterized as one based on mootness, not standing.  "Mootness has been described as

the doctrine of standing set in a time frame: The requisite personal interest that must exist at the

commencement of the litigation (standing) must continue throughout its existence (mootness)."

*Arizonans for Official English v. Arizona*,  520 U.S. 43, 68 n.22 (1997) (internal quotation marks

and citations omitted).  Yet, even properly characterized as a mootness challenge, HUD's

position is unconvincing.  Unlike the determinations on remand which constitute "final agency

action," plaintiffs were first informed of the TID in HUD's summary judgment motion filed on

July 21, 2014, and their lenders first learned of it in a subsequent e-mail on July 24, 2014.

Moreover, insofar as HUD adopted this position as a result of the present litigation, under the

voluntary cessation doctrine, HUD's decision "does not deprive a federal court of its power to

determine the legality of the practice . . . [because i]f it did, the courts would be compelled to

leave [t]he defendant . . . free to return to his old ways." *See Friends of the Earth, Inc. v.

Laidlaw*, 528 U.S. 167, 189 (2000) (internal quotation marks and citations omitted).[6]

## III.   REVIEWABILITY

HUD next argues that under APA § 701(a)(2) and the Supreme Court's decision in

*Heckler v. Chaney*, 470 U.S. 821, 828 (1985), its adoption of the MOE constitutes a settlement

with the named plaintiffs and is therefore presumptively unreviewable.  Specifically, in HUD's

---

[6] Additionally, plaintiffs allege that HUD's selective application of the TID is an attempt to "pick off" the named plaintiffs in order to render their claim non-justiciable. (*See* Pls.' Reply at 5.) Insofar as HUD contends that plaintiffs do not have standing to certify a class, this argument is also compelling.  *See Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 329 (holding that defendant may not moot a motion for class certification by providing judgment to the named plaintiffs).

view, its "decision to permit the mortgagees to assign some mortgages but not others represents a

decision outside the purview of its regulatory requirements."  (Opp. at 27-28.)  Relatedly, HUD

also argues that insofar as plaintiffs challenge the MOE, two provisions in the National Housing

Act's loss mitigation provision preclude reviewability of the requirements of the MOE program

as outlined in the Second Determination on Remand.  (*See* Opp. at 31.)  First, 12 U.S.C. §

1715u(f) states that "no provision of this chapter" shall be construed to require HUD "to accept

assignment." Second, 12 U.S.C. § 1715u(d) states that "[n]o decision by the Secretary to exercise

or forego exercising any authority under this section shall be subject to judicial review."

Plaintiffs respond that neither the APA nor the standard announced in *Heckler* applies to

HUD's actions in this case.  As plaintiffs explain, HUD's actions are "not a settlement in any

sense of the word.  It is a determination on remand that HUD never would have undertaken had

it not been ordered by this Court . . . This is not even a settlement of mortgagees' insurance

claims [because t]o the best of Plaintiffs' knowledge, none of Plaintiffs' mortgagees ha[s] even

filed insurance claims. . . ." (Pls.' Reply at 6.)  The Court agrees with this analysis.  Nothing

about HUD's actions on remand constitute a "settlement" in any meaningful sense.  This action,

as the Court of Appeals opinion recognized, is therefore subject to arbitrary and capricious

review under the APA.  *See Bennett*, 703 F.3d at 589.

Defendant's arguments on statutory non-reviewability also fall short.  Regarding 12

U.S.C. § 1715u(f), plaintiffs argue that assignment under subsection (i) is the only reasonable

option to rectify fully the legal wrong identified by *Bennett II*.  In so arguing, plaintiffs do not

run afoul of section 1715u(f).  Plaintiffs are not asking the Court to review whether a part of the

statute compels assignment under subsection (i), but rather whether *Bennett II* compels such

assignment.  Ultimately, for the reasons discussed in Part V *infra*, the Court will hold that such

assignment is not required.  Yet, this argument is not categorically insulated from review as a result of section 1715u(f).  Regarding section 1715u(d), HUD argues that because it used its discretionary authority to create the MOE, it is not reviewable.  The Court disagrees.  Like section 1715u(f), subsection section 1715u(d) limits only the types of challenges that individuals can bring against HUD for taking voluntary actions under the NHA (not, as here, challenges as to whether HUD sufficiently complied with *Bennett II*).

## IV.    THE MORTGAGEE OPTIONAL ELECTION ("MOE")

Having concluded that plaintiffs have standing and that HUD's actions on remand are reviewable, the Court now must turn to the merits of plaintiffs' case and specifically plaintiffs' challenge that the "mortgagee optional election" is arbitrary and capricious.  According to HUD's determination on remand, plaintiffs' HECMs are eligible for early assignment under the MOE so long as five conditions are met:

(1) the plaintiff must have been married to the borrower at the time of origination of the loan and until the borrower's death;

(2) the plaintiff must have title to the property or a legal right to remain on the property at the date of the election;

(3) the loan cannot be in default for any reason other than the death of the borrower at the date of the election;

(4) there can be no allegations or claims that would invalidate the loan or any such claims must be resolved in favor of the mortgagee; and

(5) the non-borrowing spouse must have had a Principal Limit Factor ("PLF") greater than or equal to the PLF of the HECM borrowing spouse at the date of origination *or* the non-borrowing spouses current PLF is greater than the current unpaid principal balance.

(Second DOR at 6.)  While plaintiffs concede that the first eligibility condition is reasonable, they argue that the final four conditions are arbitrary and capricious, an abuse of discretion, and contrary to law.  (*See* Pls.' Reply at 14.)

The Court disagrees.  Conditions (2)-(4) are each rationally related to the fitness of a loan for assignment to HUD.  Specifically, the second condition, that the plaintiff must either have title to the property or the legal right to reside there, is based on the need to allow assignment of HECM loans only when they actually benefit non-borrower surviving spouses.  (*See* Opp. at 40.) This is to say, if a non-borrower surviving spouse no longer has a right to remain in the home, then it is not arbitrary and capricious for HUD to prevent assignment of the HECM.  The third condition, that the loan cannot be in default for any reason other than the death of the borrower at the date of election, is also rationally related to the fitness of the loan for assignment to the government.  As HUD correctly notes, "[i]f the mortgage is in default for such other reasons, it is subject to being foreclosed for those independent reasons." (*Id.*)  Contrary to plaintiffs' contention that HUD has "ignored [these surviving spouses] right to cure" such defects (Mot. at 29), HUD has simply chosen to codify the rule that a surviving spouse must cure these actions prior to the mortgagee assigning the loan to HUD.  The fourth condition, that there be no allegations or claims that would invalidate the loan, also is not an arbitrary and capricious condition of participation in the MOE program.  As HUD explains, it may "only take assignment of a valid first lien mortgage under the jurisdiction where the property is located," and where there is a counterclaim that calls into question the validity of the mortgage, HUD has decided that it should not take on such a loan.  (Opp. at 42.)  This decision is far from arbitrary and capricious.  Under the MOE, HUD is taking on a reverse mortgage where eventual repayment is based largely on the ability to sell the home upon the death of the non-borrower surviving spouse.  Absent assurances that the HECM is valid, HUD is rightly concerned that it may not be able to use the proceeds from the sale to pay down all or most of the loan at the time of the non-borrower spouse's death.  (*See id.*)

The fifth condition—the PLF test—presents a distinct and more troubling legal issue for two reasons.  First, unlike the three conditions discussed above, the fifth condition is based primarily on the financial stability of the HECM program and not on the assignability of any loan in particular.  Second, the fifth condition is difficult, if not impossible, for the named plaintiffs and other surviving spouses to meet. Despite these concerns, however, the imposition of the PLF test as a condition for participation in the MOE program passes muster under the deferential standard of the APA.

First, the issue of the ongoing financial viability of the HECM program is a reasonable basis upon which HUD can set conditions for assignment.  The error identified by this Court in *Bennett II* was HUD's improper decision to insure loans which did not protect the surviving spouse of the borrower. *Bennett*, 2013 WL 5424708, at *7.  On remand, when faced with deciding what remedy, if any, to which plaintiffs were entitled, it was entirely reasonable for HUD to consider the ongoing financial stability of the reverse mortgage program when crafting a solution.  As the Court of Appeals has explained in a similar context, so long as "the agency has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made [its decision is not arbitrary and capricious]. The agency's explanation cannot run [] counter to the evidence, and it must enable us to conclude that the [agency's action] was the product of reasoned decisionmaking." *Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 588 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

Here, "after carefully evaluating the cost of the deferral being offered to ensure the continued financial viability of the HECM program," "HUD determined that – if it intended to operate the program going forward . . . this was an essential requirement." (Opp. at 43 (citing AR

2445); *see also, e.g.*, AR 1396-98.)  While it is possible that HUD could have accounted for these needed cost savings in other ways, plaintiffs have failed to meet their burden of showing that HUD's decision to do so was arbitrary and capricious and not merely a policy decision with which they disagree.  *See Worldcom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001).

Second, though the Court agrees that the PLF condition is difficult to meet (and that none of the named plaintiffs presently can meet this condition), that does not render the condition, or the MOE program, arbitrary and capricious.  The PLF condition can be met in one of two ways. (Opp. at 39.)  The first way is if the surviving spouse would have had a PLF greater than or equal to the borrower at the time the loan was originated.  (*Id.*)  As plaintiffs accurately point out, however, "[t]his will pretty much never happen."  (Mot. at 26.)  While the PLF is based on several factors, the variable that drives the PLF number is the age of that borrower.  Because a younger borrower is likely to live longer than his older spouse, he will almost always have a lower PLF at the time the HECM contract is entered into.

The second way that the PLF condition can be met is by showing that the non-borrowing spouse's PLF would have been greater than the current unpaid principal balance.  Because this calculation is based on the present state of the loan, it can be altered based on the actions of the surviving spouse after the HECM is consummated.  It is therefore applicable—at least in theory—to plaintiffs.  In fact, as HUD correctly points out, if a non-borrower surviving spouse wants to meet this condition, he or she need only pay back some of the amount of the loan.  (*See* Opp. at 39.)  Just because the PLF condition may require surviving spouses to take additional action—and pay additional money to their lenders—in order to be eligible for the MOE, does not cause its inclusion as a condition of the program to be arbitrary and capricious.  Ultimately, "HUD's use of th[is] hypothetical principal limit . . . in effect puts each plaintiff in the position

he or she would have been in had the private contractual agreement entered into contained terms consistent with Mortgagee Letter 2014-07, rather than the terms the plaintiffs' respective spouses actually bargained for." (*Id.* at 43.)  Doing so protects the viability of the reverse mortgage program, which is a reasonable consideration for HUD.

Finally, the Court must emphasize that HUD was not required to create the MOE program in the first place.  The Court of Appeals made clear in its prior opinion that even "[if plaintiffs succeeded on the merits, p]erhaps HUD would provide the precise relief we have outlined, perhaps it would find another alternative, or perhaps it would decide no such relief was appropriate.  We recognize that, even if the district court issues a declaratory judgment, appellants still have no guaranty of relief."  *Bennett*, 703 F.3d at 589.  The error, as *Bennett II* explained, was that "HUD violated 12 U.S.C. § 1715z-20(j) when it insured the reverse mortgages of plaintiffs' spouses pursuant to agency regulation, which permitted their loan obligations to come due upon their death regardless of whether their spouses (plaintiffs) were still alive." *Bennett II*, 2013 WL 5424708, at *7.  On remand, HUD chose to create a program to permit the assignment of HECM loans from lenders to HUD so long as the non-borrower surviving spouse meets certain requirements.  These requirements are functionally the same as the requirements this surviving spouse would have had to meet had she been a party to the original HECM (or if the now deceased borrower spouse attempted to take out an HECM today).

Ultimately, HUD cannot turn back the clock and require plaintiffs' spouses to enter into a different HECM contract with their lenders.  In light of this reality, the MOE is an entirely reasonable program whereby mortgagees may assign HECMs to HUD, so long as certain criteria

are met.  The Court recognizes that this may not be as desirable an outcome as plaintiffs would

like, but the Court does not find that it was arbitrary and capricious.[7]

## V.      IMMEDIATE ASSIGNMENT

Plaintiffs next allege that HUD has withheld agency action and acted in an arbitrary and

capricious fashion in violation of the APA by failing to require, or at least request, the

assignment of all HECM loans of non-borrower surviving spouses. (*See* Pls.' Reply at 9-10.)

Specifically in plaintiffs' view, absent such a remedy, "lenders are free to exercise their rights to

foreclose on Plaintiffs homes" and therefore assignment to HUD presents the only remedy

guaranteed to protect surviving spouses.  (*Id.* at 11.)  Plaintiffs further contend that HUD has the

authority to compel such assignment under 12 U.S.C. §1715z-20(i) ("subsection (i)"), which

states that

> [n]otwithstanding any other provision of law, and in order to further the purposes of the
> program authorized in this section, the Secretary shall take any action necessary—(A) to
> provide any mortgagor under this section with funds to which the mortgagor is entitled
> under the insured mortgage or ancillary contracts but that the mortgagor has not received
> because of the default of the party responsible for payment . . . [including] accepting an
> assignment of the insured mortgage notwithstanding that the mortgagor is not in default
> under its terms, and calculating the amount and making the payment of the insurance
> claim on such assigned mortgage.

In support of their position, plaintiffs emphasize that assignment pursuant to subsection (i) was

the exact remedy envisioned by the Court of Appeals when it wrote, albeit in *dicta*, that "[i]t

does appear to us, however, that HUD has additional statutory means to provide complete relief

to both appellants and their lenders, and at least one such avenue of relief would remove

---

[7]  The Court should stress that HUD has also agreed to find ways to apply the MOE program to
all non-borrower surviving spouses—not just the named plaintiffs—and while doing so, not to
require immediate foreclosure.  (*See* INFO Letter #14-34, June 30, 2014 [ECF No. 32-3].) Given
this change in HUD's position, the Court need not address the question of whether it is arbitrary
and capricious to limit this decision to the named plaintiffs, nor is it necessary to remand the case
back to the agency on this ground.

speculation as to independent third-party actions.  That statutory provision is 12 U.S.C. § 1715z–20(i)." *Bennett*, 703 F.3d at 588.

Defendant responds that "[t]he Department does not have the legal authority to require the Mortgagees to file an assignment claim; nor except under conditions not present here, does section 255(i) of the NHA create a duty for the Department to accept an assignment." (First DOR at 12; *see also* Opp. at 36 (citing AR 1482) ("[W]hen a mortgagee *requests* assignment in accordance with the regulations; it does not give HUD the authority to demand assignment.").) HUD further responds that that even if it were able to compel assignment, doing so might constitute an unconstitutional taking and it is not required to do so under *Bennett II*.

The Court agrees with HUD.  Whether HUD is required or permitted to compel immediate assignment under the "necessary" clause in subsection (i) is a question that must be analyzed under the familiar framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  "Under *Chevron* Step One, the court applies the traditional tools of statutory construction in order to discern whether Congress has spoken directly to the question at issue."  *Eagle Broad. Group, Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009) (citing *Chevron*, 467 U.S. at 842-43).  "If this 'search for the plain meaning of the statute . . . yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate.'"  *Id.* at 552 (quoting *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)).  Under that circumstance, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

If, however, the court finds that "the statute is silent or ambiguous with respect to the specific issue," the court will proceed to Step Two of the *Chevron* analysis and consider whether the agency's interpretation of the statute is arbitrary and capricious.  *See Chevron*, 467 U.S. at

843.  At this second step, the agency's interpretation is "given controlling weight unless" it is

"manifestly contrary to the statute."  *Id.* at 844.  The question at this step "is not whether the

[plaintiffs'] proposed alternative is an acceptable policy option but whether the [agency action]

reflects a reasonable interpretation of [the statute]." *Coal. for Common Sense in Gov't*

*Procurement v. United States,* 707 F.3d 311, 317 (D.C. Cir. 2013).

At Step One, the Court is satisfied that plaintiffs have failed to identify any unambiguous

statement by Congress in subsection (i) that requires or permits HUD to compel third-party

mortgagees to assign HECMs.  Plaintiffs argue that "[t]he only way HUD can lift the foreclosure

requirement and pay lender claims is to accept assignment, which it admits it has the power to

do."  (Pls.' Reply at 10.)  Therefore, in plaintiffs' view, HUD must accept immediate

assignment. (*Id.*)  However, in so arguing, plaintiffs improperly conflate mandatory acceptance

of assignment *at the election of the lender*—which HUD expressly recognizes it can require in

the MOE—and mandatory assignment *at the election of the government*.  Because nothing in the

text of subsection (i), or any other source relied upon by plaintiffs, compels HUD to take

immediate mandatory assignment at the election of the government, the Court must conclude that

subsection (i) is ambiguous.

Proceeding then to *Chevron* Step Two, the Court is satisfied that HUD's interpretation of

subsection (i) as not requiring mandatory assignment is neither arbitrary nor capricious.  The

simple fact is that plaintiffs fail to identify any evidence in the record, the statute, or its

legislative history indicating that HUD is legally permitted or required to compel assignment of

HECMs from private third parties to the government.  Rather, plaintiffs argue subsection (i)'s

general statement that HUD "shall take any action necessary" means that HUD has "unfettered

*legal* power to afford complete relief to surviving spouses, either through payments to the lender

or by accepting assignment of the mortgage," including the right to compel immediate

assignment. (Mot. at 18 (emphasis in original).)  While plaintiffs are correct that the Court of

Appeals indicated in *dicta* that subsection (i) might permit such assignment, the Court of

Appeals also expressly cautioned that "subsection (i) does not permit HUD to take *any* action to

further *any* purpose of the program, [but rather] . . . [HUD has the] authority to take *certain*

actions to effect the *particular* goals." *Bennett*, 703 F.3d at 588 (emphasis in original).  Plaintiffs

have failed to show that HUD has the authority to compel assignment under the NHA.  HUD

concluded based on the extensive administrative record that it may create a program to take

assignment at the lenders' election (such as the MOE), but it may not take the specific action of

compelling assignment.   Under the highly deferential standard of *Chevron*, this conclusion is not

arbitrary or capricious.

The Court is further satisfied that even if HUD *could* compel assignment—or strongly

request it—it is neither arbitrary nor capricious for HUD to choose not to do so   As this Court

has consistently explained, the legal error identified in *Bennett II* was the decision to insure loans

that did not protect surviving spouses.  However, once those loans were consummated, an

independent contractual relationship was created between the borrowing spouses and the third-

party mortgagees.  HUD's sole role after the creation of this contract was to insure these loans.

Through Mortgagee Letter 2014-07, HUD has assured that in the future no further contracts

which fail to protect surviving spouses will be consummated.  Yet, nothing in *Bennett II*

guaranteed surviving spouses the right to have their deceased spouses' HECMs assigned to

HUD.

## VI.     THE TRIGGER INAPPLICABILITY DECISION ("TID")

For the first time in its motion for summary judgment filed on July 21, 2014, HUD

identified another potential remedy available to plaintiffs—the TID.  In challenging plaintiffs'

standing to bring the present lawsuit, HUD argued that "as a result of the invalidation of 24

C.F.R. § 206.27(c)(1), section 206.125 no longer requires the mortgagees holding plaintiffs'

spouses mortgages to institute and prosecute foreclosure proceedings within specified

timeframes as a result of the spouses' deaths." (Opp. at 23.)  Any mention of this remedy is,

however, conspicuously absent from the determinations on remand and the administrative

record, despite the fact that the Commissioner claims to have "considered all potential options on

remand." (First DOR at 1.)  For the reasons discussed below, the Court finds HUD's failure to

consider this remedy in its determination on remand to be arbitrary and capricious and

accordingly will remand the case to HUD for further consideration in light of this decision.

As the Court understands it, under the TID, the death of the borrowing spouse is no

longer a triggering event under section 206.27(c)(1) according to HUD.  Therefore, at least as far

as HUD is concerned the mortgagee is not required to foreclose on the non-borrower surviving

spouse's home in order to benefit from the government's HECM insurance program.  (*See* Bene

E-mail at 1 (the lender "may elect to hold the HECM loan" because 24 C.F.R. 206.27(c)(1) "does

not trigger the time frames pursuant to 24 C.F.R. 206.125").)  Put differently, the effect of the

TID is that the relationship between HUD and the mortgagee does not change as a result of the

death of the borrowing spouse and the mortgagee may continue to hold on to the reverse

mortgage (and earn interest insured by the government) without instituting immediate

foreclosure.  Then, if the loan reaches 98% of the maximum loan amount, the mortgagee may

assign the mortgage to HUD. (*See* Gov't Reply at 4.)  Admittedly, this interpretation of section

206.27(c)(1) has no impact whatsoever on the contractual relationship between the mortgagee and the mortgagor, and pursuant to the contract between the two, the mortgagee still may choose to foreclose on the non-borrower surviving spouse.  That said, absent the triggering event, the mortgagee has a significant financial incentive not to foreclose on the non-borrower surviving spouse: namely, the ability to continue earning interest on a loan that is fully insured by the federal government up to the maximum loan amount.

Importantly, this decision is not a voluntary creation such as MOE, but rather, in HUD's words, is the "*automatic* result of the Court's ruling in *Bennett II*." (Gov't Reply at 8 (emphasis in original).)  That said, HUD also concludes that this remedy is limited to the named plaintiffs in *Bennett* and *Plunkett* only and not to similarly situated non-borrower surviving spouses. (*See* Gov't Reply at 4 ("[T]he death of the borrowing spouse is no longer a regulatory trigger for the requirement under § 206.125 that [named] plaintiffs' spouses' mortgagees foreclose within a particular time from the borrower's death."); Bene E-mail at 1 ("the regulation *only as to the* Bennett *and* Plunkett *HECMs does not trigger the timeframes*.") (emphases added).)   HUD reaches this conclusion by observing:

> [HUD] viewed the decision in *Bennett II* as equally binding with regard to the *Plunkett* plaintiffs . . . [because] the Court has indicated that it views *Bennett II* as controlling as to the issue of the validity of 24 C.F.R. § 206.27(c) for the *Plunkett* plaintiffs as well . . . [and t]hus, HUD has assumed that the Court will hold 24 C.F.R. § 206.27(c)(1) invalid as to the *Plunkett* plaintiffs . . . .

(Gov't Reply at 2-3.)  Yet, according to HUD, "the Court has refrained from so holding as to the entire putative class [of non-borrower surviving spouses] and HUD makes no such assumption with regard to the class."  (*Id.*)

What the basis is for HUD's assumption that the Court would hold 24 C.F.R. § 206.27(c)(1) invalid as to the *Bennett* and *Plunkett* plaintiffs and not to other surviving spouses is

unfathomable.  As best the Court can tell, this conclusion is based on an overly narrow—and ultimately incorrect—reading of *Bennett II*.  In the First Determination on Remand, the Assistant Secretary for Housing characterized *Bennett II* as a "determin[ation] that the Federal Housing Administration, a division of HUD, had erroneously endorsed the Bennett and Joseph mortgages for insurance under the HECM program because the mortgages did not contain language deferring the due and payable status of the mortgages until the death of the mortgagors' spouse, the sale of the home, or some other listed event as required by subsection 225(j)." (First DOR at 1; *see also id.* at 8 ("According to the District Court in this case, the Department erroneously entered into contracts of insurance with two private mortgagees, and in doing so committed legal errors that I am now charged with addressing.").)  The agency also applied this cramped reading of the Court's decision in *Bennett II*—that the legal error was insuring the Bennett and Joseph HECMs—in the Second Determination on Remand when it explained, "[t]he Court-identified error in *Bennett* was the Department's endorsement of the two HECMs at issue in *Bennett*. . . ." (Second DOR at 1.)  HUD's attorneys now adopt the same position in their motion for summary judgment and related pleadings.  (*See* Opp. at 23 ("The Court has previously held that 24 C.F.R. § 206.27(c)(1) is invalid as to Mr. Bennett and Mrs. Joseph. . . .").)

While HUD is correct that *Bennett II* applied only to the plaintiffs that were parties to that case, to characterize the error of law identified by the Court in such narrow terms is incorrect. Not a single word in *Bennett II* discussed the particular circumstances of Mr. Bennett or Mrs. Joseph or the underlying facts of their loans.  To the contrary, the Court emphasized throughout *Bennett II* that the error of law was that HUD violated the express statutory intent of Congress by insuring reverse mortgage loans that failed to protect non-borrower surviving spouses. *See, e.g.*,

*Bennett II*, 2013 WL 5424708, at *5 ("Subsection (j) means what it says: the loan obligation is deferred until the homeowner's *and* the spouse's death.")

The Court made this decision at *Chevron* Step One and held that Congress had unambiguously required the protection of non-borrower surviving spouses under subsection (j)— not that Congress had unambiguously required the protection of Mr. Bennett and Mrs. Joseph. The *Bennett* plaintiffs were not wronged for any individualized reason; they were wronged because they were non-borrower surviving spouses. Therefore, insofar as the TID applies to the plaintiffs in *Bennett II* "automatically" (Gov't Reply at 8), the Court sees no reason why it should not equally apply to all similarly-situated surviving spouses including the *Plunkett* plaintiffs.

As far as the Court can tell, the only justification for HUD's overly narrow interpretation of *Bennett II* is the statement in that opinion that "HUD's regulation as *applied to plaintiffs* is invalid." *Bennett II*, 2013 WL 5424708, at *7 (emphasis added). The term "as applied" generally refers to a challenge based on "a particular set of circumstances," *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2647 (June 25, 2013), or based "on the facts of a particular case or in its application to a particular party," Black's Law Dictionary 94 (9th ed. 2009). "As applied" challenges are distinguishable from "facial challenges" which require plaintiffs to "establish that no set of circumstances exist[] under which the [regulation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Court could not have classified the *Bennett* challenge as a classic facial challenge because, as HUD correctly noted at the time,

> [i]t is not difficult to identify situations in which § 206.27(c)(1) and § 206.125(a) could be validly applied even under Plaintiffs' reading of the statute. First, they can obviously be validly applied to an unmarried borrower who is the sole mortgagor on her home. In that case, there is only one mortgagor, and no non-borrowing spouse. Second, they can obviously be applied to married borrowers who are both mortgagors on the HECM note,

28

because the HECM would not become due and payable until both spouses died. Thus, the Plaintiffs' challenge to the HECM regulation could not succeed as a facial challenge.

(*Bennett v. Donovan*, 11-cv-498, Def.'s Combined Mem. in Support of His Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ. J., June 10, 2013 [ECF No. 34], at 33).  In other words, because the regulation as a whole did not violate the statute, the Court concluded that the challenge was "as applied" to plaintiffs *as surviving spouses*.  *Bennett II*, 2013 WL 5424708, at *7 & n.7.  Nothing in the opinion limited the Court's legal reasoning to the plaintiffs in that case or indicated that its decision would not have precedential value in identical cases concerning other surviving spouses.[8]

At various times during the course of the remand and the present litigation, HUD demonstrated that it understood the legal holding in *Bennett II* to apply to any wronged surviving spouse, not just the named plaintiffs.  For example, in the Assistant Secretary's First DOR she explained that "[t]he District Court found that this regulation, which is set forth as an eligibility requirement under subpart B of HUD's HECM regulation, does not properly implement [] subsection (j) of the statute" and "I cannot find that *the non-borrowing spouses* are equitably entitled to any form of relief. . . ."  (First DOR at 4, 16 (emphasis added).)  Moreover, the

---

[8] This case demonstrates the inherent difficulty with classifying some administrative challenges as "as applied challenges" and others as "facial challenges."  The concept of facial and as-applied challenges comes from constitutional law, not administrative law, and in that context scholars have recognized that often the as applied/facial dichotomy represents nothing more than a distinction without a difference.  *See, e.g.*, Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill Rts. J. 657, 660 (2010) ("Conflating these independent concepts with one another under the "facial" and "as-applied" rubric has only served to confuse each and obscure the real issues that animate the outcome in a given case."); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1324 (2000) ("[T]here is no single distinctive category of facial, as opposed to as-applied, litigation. Rather, all challenges to statutes arise when a particular litigant claims that a statute cannot be enforced against her."); Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 239 (1994) ("Reliance on ultimately superficial distinctions between facial and as applied challenges to statutes only confuses the underlying concerns of substantive constitutional doctrine and institutional competence that govern the resolution of each case.").

Assistant Secretary noted the existence of the *Plunkett* class action and reasoned that it would be "irresponsible for the Department to render a determination without first considering the implications in light of this putative class action [because] [t]he Department must be prepared to extend, if necessary, the relief determined appropriate in this matter to an entire class of non-borrowing spouses . . . ."  (First DOR at 17.)  HUD also chose to apply the TID to the four named plaintiffs in *Plunkett* who were not parties to the original *Bennett* lawsuit because in HUD's words, "the *Bennett* [decision is] equally binding with regard to the *Plunkett* plaintiffs."  (*See* Gov't Reply at 2.)  For HUD to come back to the Court now and say that the holding in *Bennett II* only applies to the named plaintiffs in both *Bennett* and *Plunkett* because the *Bennett* challenge was "as applied" is simply disingenuous.

It is well-established that "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996); *Nat'l Ass'n of Broadcasters v. FCC,* 740 F.2d 1190, 1201 (D.C. Cir. 1984); *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982) ("Government is at its most arbitrary when it treats similarly situated people differently."); *Doubleday Broad. Co. v. FCC,* 655 F.2d 417, 423 (D.C. Cir. 1981) (it is arbitrary and capricious to "decid[e] a case one way today and a substantially similar case another way tomorrow without a more reasonable explanation").  HUD has to this point not identified any reason, better yet a legitimate reason, for differentiating named plaintiffs from all other surviving spouses.  Admittedly, HUD has at times represented to the Court that individualized determinations might be necessary based on the individualized facts of each loan. (*See, e.g.*, Def.'s Supp. Opp. to Pls.' Mot. for Class Cert., Aug. 11, 2014 [ECF No. 46], at 5-6.)  Yet, HUD does not identify in its papers why, at least in regard

to the TID, the *Bennett* and *Plunkett* plaintiffs are distinguishable from any other surviving

spouse except insofar as they sued in their own names.

Accordingly, the Court concludes that HUD's failure to consider the TID in its

determinations on remand, which by its own assessment is the automatic result of *Bennett II*, is

arbitrary and capricious.  HUD simply cannot argue that it considered all potential options on

remand and then, at the summary judgment stage, identify a brand new remedy that is both

"automatic" and also serves to negate plaintiffs' standing.  Either HUD considered the TID and

failed to discuss it in its determinations on remand or it considered this remedy at the summary

judgment stage for the first time.  Regardless, HUD acted arbitrarily and capriciously by not

fully considering the TID in its final agency action and the Court therefore is left with no other

choice but to remand to the agency.  On remand, HUD is instructed to consider whether the

remedy of the TID applies to non-borrower surviving spouses.   The Court should emphasize

that at present it sees no reason why an "automatic" rule is only automatic at the moment an

individual sues HUD, but that question is up to the agency in the first instance.

## VI.   CLASS CERTIFICATION

Federal Rule 23(b)(2), which is the only ground for certification that plaintiffs have

invoked, permits certification where "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole . . . ." This provision "permits

class actions seeking final injunctions or corresponding declaratory relief for the entire class,"

and "[u]nlike class actions for monetary relief under Rule 23(b)(3), there are no additional

requirements of notice and opt-out rights, and the plaintiff need not establish that a class action

would be superior to individual actions or that common legal and factual questions

predominate." *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006) (citation omitted).

    Having now concluded on the merits that HUD's actions on remand were not arbitrary and capricious, except insofar as HUD failed to consider the TID in its determinations on remand, there remains no basis for class certification at this time.  The Court has already concluded that neither the MOE program nor the decision not to compel immediate assignment is arbitrary and capricious and these decisions are equally applicable to any purported class member.  Moreover, HUD has already represented to the Court that it is working to apply the MOE program to all surviving spouses.  Finally, because HUD now has the opportunity to consider the application of the TID in the first instance on remand, including whether the TID applies to all non-borrower surviving spouses, it remains premature to consider the issue of class certification.  Accordingly, the Court will deny plaintiffs' motion for class certification *without prejudice* pending the agency's determination on remand.

## CONCLUSION

    For the foregoing reasons, the Court grants in part and denies in part plaintiffs' motion for summary judgment and grants in part and denies in part defendant's cross motion for summary judgment.  Plaintiffs' motion to dismiss is denied.  The case is remanded to HUD to consider whether the remedy of the TID applies to non-borrower surviving spouses.   Plaintiffs' motion for class certification is denied without prejudice.  A separate order accompanies this Memorandum Opinion.

                              _____/s/_____
                              ELLEN SEGAL HUVELLE
                              United States District Judge

DATE:  August 28, 2014